**In the United States District Court**
**For the Eastern District of Pennsylvania**

James E. Rose, Jr.                    No: _____
        Plaintiff                **Jury Trial Demanded**

    V

Coleen Christian;
Bucks County;
Bucks County Prothonotary's Office
        Defendants

**Complaint**

**Jurisdiction**

These Civil Rights Violations fall under the Jurisdiction of **Title 42 USC Sections 1981**, **1982**, **1983**, **1985**, **1986**, and **15081, 42 U.S.C. ch. 35 § 3001 et seq, 15 USCA § 15b, 28 U.S.C.A. § 1343**, the **Older Americans Act** and the 1964 Civil Rights Act as well as the **1st, 4th, 5th, 6th, 8th and 14th Amendments of the United States Constitution** that were, at all times relevant, violated in the instant Case as well as the **Civil Rights Act of 1866**. In that, this Honorable Court has exclusive Jurisdiction over these Civil Rights Violations now complained of.

It is maintained that at all times relevant the named and unnamed Defendants were Acting Under Color of State Law while Operating in their Official Capacity or were acting in Concert with those Acting Under Color of State Law.

**Brief History**

1.   In 2011, Plaintiff lost his son, Jason Rose, who is also the father of S.R. At the time Plaintiff lost his son, he was emotionally weak, and he filed for custody of his minor granddaughter because, prior to that the Plaintiff did have custody of his minor granddaughter which was given to him by the Lehigh County Court and the Pennsylvania State Police who refused to let Stevie Harris and her family have custody of the minor child, S.R.

2.   In 2011, Plaintiff's late son, Jason Rose, had full custody of his daughter, S.R. At this time, Plaintiff's son had given up the use of illegal drugs. The last words the Plaintiff's minor son had with the Plaintiff was that he intended to divorce his then wife, Jessica McNeil-Rose.

3.   He further told the Plaintiff that he wanted nothing more to do with any drugs, and that he was clean and he was going to stay clean for the sake of his minor daughter.

4.   At this time, Plaintiff did not know that Jessica McNeil told Plaintiff's son, Justin rose, that she could have anybody murdered her heart desired. When this statement was made, Justin Rose never informed the Plaintiff. If he would have, Plaintiff believes that his son would be alive to this very date.

5.   Plaintiff's son, Jason Rose, was murdered in Wilson Borough, PA. The investigating detective, Krause, who is a material witness in this case, told the Plaintiff on an audio recording that during his investigation, he believed that the Plaintiff's son, Jason Rose, was murdered and that he just could not prove it.

6.   When Plaintiff got word that his son passed away at some time mid-morning, after 1AM, that same day at approximately 8:00 in the morning, S.R. was released to her natural grandfather, the Plaintiff.

7.   While the minor child was playing on the floor in the family room, the minor child told Mystic Rose, the minor child's aunt, and Adriane Mills, the Plaintiff's then girlfriend; the minor child stated that her father weas killed by 2 Black men that held their father in the bathroom, and that she had to wait in the bedroom, Plaintiff presumes, by another man.

8.   When the minor child was brought to the Plaintiff, she then told the Plaintiff that the 2 men had guns on her daddy and would not let her in the bathroom. Plaintiff believes that his late son, Jason Rose, was forced to snort heroine.

9.   Never, ever, ever at any time did Jason Rose ever snort heroine. Every time he OD'd on heroine it was by injection. The moment the minor child told the Plaintiff her story, the Plaintiff called Jessica McNeil and asked her what S.R. was talking about.

10.   Within a matter of 2 hours, S.R. was removed from the Plaintiff's home, and he was never to see her again. Plaintiff believes that Jessica McNeil had his son murdered, by forcing him to snort a lethal dose of heroine which was more purified.

11.   Plaintiff later found out that when he used to have a Gentlemen's Club, one of the dancers approached the Plaintiff and told the Plaintiff that she knew one of the men who was involved in the murder of Plaintiff's son.

12.   This dancer then got the father of the young man who was present when the Plaintiff's son was murdered. As soon as the young man found out that the Plaintiff wanted to talk to the man, this gentleman whom the Plaintiff never met took off to go to Chicago because, he was in fear of retaliation from the Plaintiff.

13. The young man's father met with the Plaintiff at Chris' family diner in Bethlehem, PA called the Borderline restaurant. It was at this time the father told the Plaintiff that the young man called him at 4AM in the morning to tell him that Plaintiff's son was dead.

14. The Plaintiff asked this gentleman how did his son know that the Plaintiff's son died of a drug overdose, and the father of the young man said he was not sure, but he was with some other people when it happened.

15. He then told the Plaintiff that the district Attorney's Office in Northampton County were a bunch of idiots and that they should have known the Plaintiff's son was set up by his wife, Jessica McNeil. It was a contract hit.

16. Recently, the young man is just now returning back from Chicago after 11 or 12 years of being away out of fear. The Plaintiff is trying to get the young man to talk to him but the young man is too afraid.

17. Jessica McNeil, from the information the Plaintiff could gather, was at one time a drug dealer or was at least dating in Easton, PA a drug dealer. The Plaintiff's son was divorcing Jessica McNeil and the last night Plaintiff saw his son, he told his son to be careful of how he handled the separation because, Jessica McNeil had a reputation of being a "loose cannon", "a nut job" according to the Black and Hispanic people in Easton, PA who said Jessica McNeil wanted to be a Black girl and acted Black.

18. The Plaintiff's minor granddaughter is a material witness to the death of her father. When the Plaintiff sought to get custody of his minor granddaughter, it was suggested that Jessica McNeil called down to the Bucks County Courthouse and spoke to Judge Rubenstein. Whatever Jessica McNeil said to Judge Rubenstein, it was devastating to the Plaintiff's custody rights of his granddaughter.

19. After that phone call, Judge Rubenstein came back on the bench and said the case was over, Plaintiff does not get custody, custody goes back to the child's minor. At this time Judge Rubenstein is a material witness. His deposition will be taken. The depositions of his staff members working on that particular date will be taken.

20. If the Plaintiff got custody of his granddaughter, he was going to have her placed under hypnosis so she could tell him everything she knew about what happened to her father when she was held against her will in a separate room.

21. S.R. remembered everything very clearly, but after the minor child was removed from the Plaintiff's home, that is when the cover up began with Jessica McNeil. Stevie Harris, the minor child's mother, told the Plaintiff that his son was murdered but she could not talk about it because, she did not want anything to happen to her or S.R.

22. Stevie Harris also went on to say that she and Jessica McNeil were mortal enemies, but after the death of Plaintiff's son, the 2 became friends. Jessica McNeil thinks she is a gangster because of her affiliation with drug dealers. The Easton police as well as the Wilson Borough police knew Jessica McNeil was involved with high-profile drug dealers. There is a saying going around all over the Easton area that if you want to get away with murder, you just have to commit the murder in Wilson Borough, PA.

23. The District Attorney's Office did not do their job. They did no investigation what-so-ever. Instead, they titled the Plaintiff's late son's death and accident, and nothing could have been further from the truth.

24. When the Plaintiff sought to get custody of his minor granddaughter so that the police could question her, Jessica McNeil made absolutely sure the Plaintiff would not be able to get his hands on his minor granddaughter.

25. When the Plaintiff's granddaughter talked to him, Plaintiff asked his granddaughter, "Where was Jessi when all this was going on?" The minor child stated, "Pop, Jessi was downstairs on the front porch talking to the men." She then said she was the one who found her father dead in the bathroom. From that point, the Plaintiff broke down crying and was never right ever since.

26. Plaintiff's son was murdered. Jessica McNeil, it is believed, issued a contract hit on Jason Rose. It is further believed that Stevie Harris as well as Plaintiff's minor granddaughter have direct knowledge concerning this contract hit ordered by Jessica McNeil.

27. When Jessica McNeil went to the Plaintiff's son's viewing, she refused to go up near the coffin. She asked the Plaintiff to hold her hand and walk with her. The Plaintiff regrets every day of his life that he did that.

28. The young man who was involved in the Plaintiff's son's murder has now moved back to Allentown, PA, and the Plaintiff is waiting to have a sit down with this man so that he can find out who issued the hit on his son because, the young man was in fear for his own life, and this is why he left the area, at least, this is what he told his father.

29. If the minor child was allowed to stay with the Plaintiff, there is no question that the minor child would have been very helpful to the PA State Police and Detective Krause. This is why Jessica McNeil did something to get the minor child removed from the Plaintiff's home and custody.

30. Stevie Harris let the Plaintiff's minor granddaughter alone in the worst snowstorm in 75 years, abandoned the child; left her in the car which sat off in an embankment, and if it were not for a nice, kind motorist seeing the car lights from the road, he parked his car, walked down to the car with the Plaintiff's granddaughter, took her out of the car, and called the police. Plaintiff wants to shake this man's hand, and he wants the Court to identify this man.

31. If it was not for this man, the Plaintiff's granddaughter would not be here to date; she would have froze to death because, the mother was high on drugs and was afraid of the police locking her up, but Bucks County Children and Youth placed the Plaintiff's minor daughter beck into this horrible situation.

32. When Plaintiff sought custody of his minor granddaughter, he tried to appeal the decision of the Honorable Judge Rubenstein, and the Superior Court orders will confirm that the Prothonotary's Office blocked the Plaintiff from taking an appeal to the Superior Court.

33. Because Plaintiff was so heartbroken over the loss of his son, he did not have the energy and strength to continue fighting. Currently, the Plaintiff is being denied the right to have a hearing in State Court because, it appears there is racial animosity involved.

34. All the people involved in this case are White. The Plaintiff and his minor granddaughter are the only people of Color. Plaintiff realizes that this Court does not like when the Plaintiff raises racial matters, but in the instant case, the Plaintiff can no longer stand idly by and pretend that he is not the victim of racial hatred or animosity.

35. Plaintiff seeks a trial with the Defendants or he wants to have visitation rights with his granddaughter just like the White people have, and the Plaintiff being denied the right to see his granddaughter for 11 years is a crime against humanity. No matter how this Court feels, there is racial animosity in this case.

36. The Plaintiff is not a drug dealer nor a drug user; however, his minor granddaughter is exposed to drug dealers and drug users, in that, the child's mother is facing open drug charges and perhaps for drug use.

37. Plaintiff must do everything in his power to rescue his minor granddaughter from ultimately becoming a Junkie, and if this Court does not take a position and save the life of a young child, then the Justice System is broke.

38. Bucks County Court Officials have done everything in their power to make sure the Plaintiff's minor granddaughter falls prey to drug abusers and drug users. Children and Youth for Bucks County have not monitored the Plaintiff's granddaughter nor her circumstances.

39. Bucks County Children and Youth coupled with Bucks County Court Personnel have disguised or hidden Plaintiff's minor granddaughter's circumstances which have made her a victim by isolating her from her Black family for no lawful legal reason.

40. Plaintiff's minor granddaughter cannot continue to be isolated from her Black family. As such this would be a serious **Civil Rights Violation**. Black Lives Matter will be asked to look into this situation because, the life of a young Black lady is at issue here.

41. If Bucks County Officials do not want to go through an embarrassing Civil Rights Trial, then they should do everything in their power immediately to make sure Plaintiff has visitation rights with his minor granddaughter because, currently, Plaintiff's granddaughter is only exposed to White people whether alcoholics or drug users. That is her only contact other than the shameful road her mother is taking the minor child down.

42. Plaintiff has not opened his son's room for 11 years, and the items that are in his room belong to his daughter, and she should be entitled to have her father's belongings. The White people, especially White Court personnel, are preventing the minor child from having any contact with her Black family because, no member of Stevie Harris' family has ever taken the minor child to the grave of her father. This is a human tragedy.

43. Plaintiff needs to see his minor granddaughter to protect her and make sure her life is safe. If this Honorable Court does not intervene then there is going to be a huge public outcry as to why a Federal Court would allow a State Court to continue using a practice and maintaining a policy that is detrimental to the Civil Rights and Liberties of a mixed child who has mixed blood running through her veins.

44. No child should be in this predicament. The Plaintiff is a man of Color; his granddaughter is a woman of Color, and she should not have to live her life under the umbrella of racial hatred and in fear of becoming a junkie herself. If this Court ignores helping a Black minor child then the Court would be guilty of supporting the acts of White racists on a minor child of Color.

45. Approximately some 11 years went by, and now the Plaintiff, who is a lot stronger, wants to seek monetary damages from Bucks County officials who discriminated against people of Color. Plaintiff will prove this at the time of trial.

46. The Plaintiff's minor granddaughter is back in the custody of her mother who has open drug charges. The custody case was rigged against the Plaintiff through the covert actions of Jessica McNeil who believes she is the slickest thing since sliced bread.

47. Jessica McNeil committed the crime of murder through contract, and the Plaintiff's minor granddaughter was a material witness against Jessica McNeil. This is why Jessica McNeil was able to get the Plaintiff's minor granddaughter removed from his house the day of his son's death.

48. The Plaintiff will take the deposition of Jessica McNeil and prove that she is the scum of all scum.

49. Plaintiff will also take the deposition of his minor granddaughter as well as Stevie Harris. It is believed Stevie Harris knew about the contract hit on the Plaintiff's son because, Stevie Harris and Jessica McNeil were mortal enemies until the death of Plaintiff's son.

50. This case is not going to be rigged or thrown out because, the Plaintiff is up against a bunch of White people who killed his son. When Plaintiff went down to Quakertown Farmer's Market, he stopped by the home of Stevie Harris. He did not know Jessica McNeil was in the house. Plaintiff sent Adriane Mills to see if Stevie Harris would allow the Plaintiff to say "Happy Birthday" to his granddaughter.

51. At that time, Plaintiff did not know that Jessica McNeil was in the house with Stevie Harris, and Jessica McNeil acted like the lowest scum on the Planet earth. She started yelling at the Plaintiff and telling the Plaintiff to get away from the house because, she was going to call the police.

52. Plaintiff left because, he was double parked in the middle of the street and went directly to the farmer's market. When the Plaintiff, his minor son, and Adriane Mills left the farmer's market, the Plaintiff was pulled over and it was said that he was carrying a weapon.

53. The Quakertown police made a terrible mistake because, Plaintiff did not have a weapon, but Stevie Harris or Jessica McNeil filed a false police report, and Plaintiff should have pursued that false report because, Plaintiff did not have a gun and his car was searched by 3 or 4 police officers. These officers determined there was no weapon.

54. Adriane Mills was terrified and so was the Plaintiff's minor son who was 5 years old; he started crying because, he thought the police were going to lock his daddy up. The Richland Township police officer said he pulled Plaintiff over at the

request of the Quakertown police department. He also said that he was very sorry, but he had a job to do.

55. Plaintiff then returned back to Allentown, and because of the pain he was suffering with the loss of his son, he did not pursue litigation against the Quakertown police department who acted on a false police report. Plaintiff did file in this Court and withdrew that law against the Quakertown police because the Plaintiff was emotionally drained through the loss of his son.

56. Accordingly, to this date, Bucks County Prothonotary or Clerk's Office has done everything in their power to block the Plaintiff from having a hearing for visitation rights with his minor granddaughter.

57. This is why the Plaintiff is filing suit against Bucks County for maintaining a racist practice against people of Color and for blocking the Plaintiff from being able to take an appeal some 11 years ago and for refusing to transcribe the testimony conducted in front of Judge Rubenstein.

58. The Superior Court records will show everything the Plaintiff is writing is the absolute truth. Bucks County treats people of Color differently, and in fact, has a practice and policy that strips people of Color of their **Civil Rights and Liberties while Acting Under Color of State Law** in violation of **Title 42 1983** and the **1964 Civil Rights Act** which was designed to protect people of Color from this very same type of racist abuse.

59. Plaintiff is going to prove that certain State Officials in Northampton County covered up the crime of murder by assisting Jessica McNeil, the one who issued the contract hit on the Plaintiff's son. This case is never going to go away. If the Plaintiff can talk to the young man who was present the night the Plaintiff's son died of a drug overdose the Plaintiff can ask him who asked them to kill the Plaintiff's minor son.

60.  It was a contract hit; it was a murder that happened in front of a 3 year old little girl. This petition will be sent to various media outlets so they can follow the case because, the Plaintiff's minor granddaughter may have witnessed the murder of her own father, and this case was covered up in Northampton County, PA. There was no investigation concerning Jessica McNeil who put a contact hit on the Plaintiff's son.

61.  While the killers were present, Jessica McNeil exposed the Plaintiff's minor granddaughter to witness perhaps the murder of her father. This is why Jessica McNeil called Judge Rubenstein's staff to influence the outcome of the custody hearing. This is Judge Rubenstein treated the Plaintiff in hostile manner after he took a 15-minute recess to talk to members of his staff or talk on the telephone top Jessica McNeil who bragged about calling Judge Rubenstein to get him to rule against the Plaintiff.

62.  The Plaintiff's minor granddaughter stated, "Pop, my daddy was murdered." Those were her exact words to the Plaintiff, and who was present when the little girl said this was Adriane Mills. She heard the Plaintiff's minor granddaughter make this statement. The next day was the last time the Plaintiff would ever be able to see his minor granddaughter.

63.  The Prothonotary's Office is just sitting on Plaintiff's complaint and motions. Whereas, it appears that the Plaintiff and his minor granddaughter are the victims of racial animosity and injustice.

64.  Plaintiff filed his complaint for visitation 7 months ago on 6/2/2021, and the Plaintiff maintains this would never happen to a White person similarly situated. Only people of Color are subjected to this form of human degradation.

65.  7 months delay is called an inordinate delay, and in this case, this type of injustice only happens to people of Color.

**Wherefore,** Plaintiff prays that this Honorable Court enter Judgement against the Defendants, Coleen Christian, Bucks County, and Bucks County Prothonotary's Office, whereas a Jury Trial is Demanded and Plaintiff seeks damages in excess of $500,000 punitive and $500,000 nominal from each Defendant.

Respectfully Submitted,

January 15, 2022

James E. Rose, Jr.

13

**Extenuating Facts**

1.   The fact is the Plaintiff's minor granddaughter found her father dead; she is a material witness to the murder of her father.

2.   On the morning of the minor child's father's death, the minor child started telling the Plaintiff information about the death of her father.

3.   When Plaintiff contacted Jessica McNeil to ask her why she lied to the police department, the very next day, the Plaintiff's granddaughter was removed from his house and he was not to see her ever again.

4.   Plaintiff raised his minor granddaughter for the first 3 years of her life. It was from the Plaintiff's home that the little girl became extremely, extremely intelligent. So intelligent, she made her father drive her to the Plaintiff's home at 10 o'clock in the morning so that she could have the chocolate milk that her grandfather purchased for her.

5.   The minor child made her father laugh when she refused to drink his chocolate milk but demanded that he drive her to her pop pop's house in Allentown, PA.

6.   Plaintiff's granddaughter was a material witness in the murder of her father. How does the Plaintiff know? Because of what the little girl was telling the Plaintiff the day of her father's death.

7.   The mistake the Plaintiff made was when he called Jessica McNeil to ask her why she lied to the Wilson Borough police department.

8.   The following day, the Plaintiff was never to see his granddaughter again. Plaintiff believes that his granddaughter saw the men who murdered her father and this is why Jessica McNeil and Stevie Harris did everything in their power to keep the minor child away from being around her grandfather.

9.   A White woman can murder a man of Color and get away with it in Northampton County, PA.

10. Jessica McNeil was so paranoid of the Plaintiff that she contacted the Wilson Borough police department and told the Wilson Borough police department that Plaintiff was starling her at her home. This was the biggest lie that Jessica McNeil told on the Plaintiff.

11. The day Jessica McNail made the complaint to the Wilson Borough police department, the Plaintiff was contacted by the Wilson Borough police department who asked the Plaintiff why he was driving around the home of Jessica McNeil.

12. A show of police records will reveal the name of this police officer.

13. What the Plaintiff did is he told the Wilson Borough police officer he was in Reading, PA, and it was impossible for him to be stalking Jessica McNeil.

14. Plaintiff was so aggravated with this false accusation that he pulled over a Reading Police officer and had the Reading police officer talk to the Wilson Borough police officer who stated that Plaintiff was in Reading, PA.

15. After that, the Wilson Borough police officer told the Plaintiff not to go around Jessica McNeil.

16. This is not the first complaint that Jessica McNeil made against the Plaintiff. Plaintiff has never had any bad words with Jessica McNeil. There was a Black young man from Easton who came to the Plaintiff's night club and told the Plaintiff that Jessica McNeil had his son murdered and this man was a drug dealer who Jessica McNeil used to sell drugs for.

17. This drug dealer begged and pleaded with the Plaintiff not to get him involved. This man went on to tell the Plaintiff that John Morganelli in the District Attorney's office was stupid and anybody could commit murder in Easton, PA if they do it through overdose. These were the exact words of the drug dealer who told the Plaintiff he was sorry that Plaintiff's son was murdered.

18. It is extremely important that Plaintiff be able to renew his bond with his granddaughter. In that, she may remember what she told the Plaintiff on the day her father was murdered.

19. When she told this to the Plaintiff, Plaintiff had security videotapes in the kitchen and his granddaughter was on the security videotape telling her story.

20. Plaintiff will search high and low for a copy of that VHS tape so that he can present it to the Court and to the Pennsylvania State Attorney General's Office.

21. Prior to the murder of the Plaintiff's son, Jessica McNeil and Stevie Harris were mortal enemies. They did not talk to each other. They hated each other. After the death of the Plaintiff's son the two of them became the best of friends.

22. The Plaintiff has been out of the adult business since the passing of his son. If he were still in that business, he would know more about the murder of his son. The only one who was aware that the Plaintiff's son was murdered was Detective Krause of the Wilson Borough police department who told the Plaintiff that his son was murdered, and he was 100 Million percent correct.

23. This is why Stevie Harris never let the Plaintiff see his granddaughter because, she knew the Plaintiff's granddaughter was very close to him and that she learned to talk through watching the news stations with her grandfather.

24. The minor child would sit on the kitchen table with her bottle in her mouth and watch the news stations for hours.

25. By the officials of Bucks County interfering with the Plaintiff's rights to see and be with his granddaughter is aiding and abetting in the cover up murder of his granddaughter's father.

26. The Court officials of Bucks County have been manipulated by Stevie Harris and Jessica McNeil because, they both knew that if the Plaintiff was around his granddaughter with after the death of her father, she would have told the District Attorney's Office of Northampton County what really happened.

27. Jessica McNeil was outside according to the Plaintiff's minor granddaughter. She was not in the house, she was outside talking to the 2 men. There are 2 witnesses to this story who heard the little girl tell this story to her father and how Jessica McNeil lied to the police department.

28. Plaintiff needs to see and be with his minor granddaughter. Right now, the Court of Bucks County has made it possible for the Plaintiff's minor granddaughter to live in danger. There is no one to protect the Plaintiff's minor granddaughter.

29. Bucks County Officials have interfered with Plaintiff's custody rights and visitation rights for 11 years because, it is believed that Jessica McNeil made contact with the Court during the time of the Plaintiff's custody hearing.

30. It appears that Bucks County Officials have helped Jessica McNeil and Stevie Harris cover up the crime of murder of the Plaintiff's late son.

31. May God forgive Plaintiff for forgetting about an event that happened with his late son. When Plaintiff lost my son, I thinks he lost part of his mind because, he has not been right since he lost his son.

32. Plaintiff completely and totally forgot that several nights before his son passed away, Plaintiff's late son called him and asked if Plaintiff could send out a couple crew members to back off a couple Black guys who were following him around that he did not know.

33. Plaintiff told his late son he would send some people down there and Plaintiff's late son said he would call the Plaintiff back.

34. Approximately 20-25 minutes went by and Plaintiff's late son called him to tell him that the Wilson Borough Police had the men who were following him in their custody and Plaintiff should not send anybody down.

35. When Plaintiff's son called back, Plaintiff asked why his son was out at 10 or 11 at night at a carnival in Wilson Borough. Plaintiff's sdon then started that he was home sleeping and that "the f-ing nut", his wife, called him up and made him come to the carnival.

36. Plaintiff then stated to his late son, "You have to get up at 6 o'clock in the morning, why are you at the park?"

37. Plaintiff's son, the late Jason Rose, then said to Plaintiff that Jessica McNeil lured him to the carnival by telling him his daughter would not get on the rides without her father.

38. Plaintiff then said to his son, "Take your daughter, and go home now!" Plaintiff's son followed Plaintiff's advice, got his daughter, went to his apartment.

39. Plaintiff believes with all his heart and soul that this was the beginning of his son's downfall. Jessica McNeil set Plaintiff's son up. By getting him out of bed and telling him he had to come to the carnival because, his daughter wanted him to be there.

40. Plaintiff's late son, Jason Rose, was home in bed sleeping, and Jessica McNeil lured him to this carnival where he was terrified for his safety because, the 2 or 3 Black boys were telling him they were going to get him.

41. When he got home, he called the Plaintiff again, and told Plaintiff he believed he was set up by his wife, Jessica McNeil, and it was at that time Plaintiff told him to leave her and come back home to live with the Plaintiff.

42. The Wilson Borough Police Department has the names of these then young Black men who were out to get Plaintiff's late son that evening. John Morganelli was the District Attorney at that time, and if Plaintiff had had his right mind, he would have remembered and told Detective Krause about this incident.

43. As Plaintiff was writing this Complaint, Plaintiff just remembered about that incident.

44. Plaintiff's late son emphatically told him that Jessica McNeil, Plaintiff's late son's wife, was going have him beat up by these Black guys.

45. What is crucial here for the District Attorney's Office and Wilson Borough Police Department is that they have the names of these young Black men who were out to get Plaintiff's now deceased son.

46. Plaintiff then stated to his late son, "Please, move back home. You have no business living in Easton, PA." He then told Plaintiff as soon as his custody matter with S.R. was over with, he would bring the girl and live with Plaintiff, and he needed Jessica McNeil so that he could establish to the Court that he was no longer on Heroine and that he wanted to place his daughter in a family environment.

47. Plaintiff's late son told the Plaintiff that as soon as he got full custody of his daughter, S.R., he would be moving back home with the Plaintiff because Jessica McNeal was a "f-ing nut" who did not have her right mind.

48. The Wilson Borough Police have perhaps the names of the 2 men that Plaintiff's granddaughter said killed her father.

49. The Plaintiff believes with all his heart, body, mind, and soul that Jessica McNeil put a hit on his late son, Jason Rose. This is why he was lured at 11 o'clock at night to go to the carnival in Wilson Borough, and if it were not for the Wilson Borough Police involving themselves in the case that night, the Plaintiff believes that his late son would have lost his life that night.

50. Plaintiff's late son, Jason Rose, emphatically stated to the Plaintiff that he believed that Jessica McNeil set him up to come to the carnival to be wacked by these young Black boys because, they acted like they knew her, but he could not prove it.

51. Plaintiff believes that Jessica McNeil had the Plaintiff's son murdered because, the Plaintiff's late son, Jason Rose, was going to leave Jessica McNeil just as soon as he got full custody of his daughter, S.R.

52. The Plaintiff will take a polygraph test to prove what he has written in this document is the truth and that Jessica McNeil had Plaintiff's late son murdered, and the Plaintiff's minor granddaughter, S.R., was an eyewitness to her father's death, and that is why Jessica McNeil got the Plaintiff's granddaughter out of his home the following day after the death of his son.

53. The Wilson Borough Police have the names and addresses of the two hit men who Plaintiff believes murdered Plaintiff's late son.

54. This is why Jessica McNeil kept calling the Police and making false Police reposts about the Plaintiff being around her home because, Jessica McNeil was paranoid, and she knew that she had my late son murdered.

55. Plaintiff's granddaughter was an eyewitness to the men who murdered her father, and this is why she was taken out of the home of the Plaintiff.

56. The District Attorney of Northampton County needs to open up this investigation. Plaintiff will testify in a Court of Law about what his late son told him about how Jessica McNeil tried to have Plaintiff's late son, Jason Rose, killed.

57. The Plaintiff totally forgot about this conversation he had with his son because, the loss of his son has been so devastating to the Plaintiff that the Plaintiff totally forgot about the conversation between him and his late son until he was writing this actual petition.

58. Plaintiff hopes and prays to God that his late son forgives him for totally forgetting about the two conversations he had about Jessica McNeil and the carnival.

59. The District Attorney's Office is more than welcome to subpoena Plaintiff's phone records to prove everything the Plaintiff has written is the truth and get the Wilson Borough Police records to find out who these young Black men were who were trying to kill Plaintiff's late son.

60. If the names of the Black men who were arrested by the Wilson Borough Police are retrieved, then probably it will be found the names of the men who murdered Plaintiff's son.

61. Plaintiff wishes and prays to God that he would have gone to Easton that night and forced his late son to get into Plaintiff's car with his daughter. Plaintiff will regret for the rest of his life he did not do this.

62. S.R. loved to talk to her grandfather, the Plaintiff, that is why Jessica McNeil made sure that the Plaintiff's granddaughter would be separated from him for 11 years.



| **1** | $1.96 **US POSTAGE**<br>5 OZ FIRST-CLASS MAIL FLATS RATE | 062S0009564987<br>17313006<br>FROM 18103 |
|---|---|---|
| | RETAIL | stamps<br>endicia<br>01/21/2022 |

# USPS FIRST CLASS MAIL®

Jimi Rose
911 Barnsdale Rd
Allentown PA 18103-3717

C019

SHIP
TO:

Prothonotary's Office, PAED
U.S. Federal Court House
601 Market Street
Philadelphia PA 19106-1729

RECEIVED

U.S.M.S.
X-RAY